on behalf of Mr. Harris, Ms. Ann, and Flip, on behalf of the people of the state of Illinois and the Victoria address office. Good morning. All right, I'm going to speak. Good morning, Your Honors. Good morning. My name is Ann Fick. I'm from the Office of the State Appellate Defender, and I represent the appellant defendant, Darius Harris. May it please the Court. As a result of plain error, as well as a police officer's improper testimony, the verdict here should be reversed and the case remanded for new trial. I will address the plain error argument first. Clear and obvious error occurred here twice. First, the judge failed to comply with Supreme Court Rule 431B. And second, the prosecutor made improper statements during opening statements and closing arguments, arguing facts, not in evidence. 431B requires that the trial court ask potential jurors whether they both understand and accept the four fundamental concepts of criminal law. Here, the judge did ask the jurors whether they understood, but he, instead of asking them about acceptance, he asked whether they took issue or had a problem with those concepts. Is that any different than accepting? Yes, Your Honor. How so? I mean, isn't it – it's not strict compliance with the rule? There's at least one case that does say strict compliance. Out of the third? Fourth, I think. Of the fourth? Yeah. It is out of the fourth. And then there is a subsequent one out of the third that reiterates the importance of following the Supreme Court rules. You know, as I was reading this, and I don't know if it's anybody's brief, but I had a recollection back in 2010 or 2011, the Supreme Court, a decision by Justice Fitzgerald, dealt with this particular issue and whether or not it was what they called, I believe, structural error or some phrase like that, dealing with whether or not it had to be strict compliance. Did anybody unearth that case? You might be referring to people v. Thompson? Could be. In that case – What does that stand for? Well, in that case, they did discuss bright lines, but it was about reversal. So they said, we're not going to automatically reverse because there wasn't strict compliance. Here we're asking that the strict compliance be merely with the language of the rule, and then plain error be established after that. Well, what's the difference between what you're advocating and what Thompson held? We are under – we are stating that the actual mistake of making the – instead of saying acceptance or using some other term, that in and of itself won't necessarily require reversal, whereas in Thompson, that was what the defendant was advocating for, that that error was, in fact, structural and required reversal. Here it is plain error, but the closely balanced evidence still needs to be established. Now, it's obvious that Rule 431B does contain four issues, and for lack of a better term, some of them appear or are more legalese than they are actual language, the way people would communicate on a day-to-day basis. Is there any other script out there that the Supreme Court has issued on this particular issue, on this error issue? As far as a script, not that I'm aware of, if I may go back to Justice Shostak's question about what the difference is between take issue and accept. Take issue is ambiguous, and it is subject to different interpretations. There is no reason not to adhere to the very clear language that's already in the rule, understanding and acceptance. There's eight questions that need to be asked for 431B, and four of those are about understanding and four of those are about acceptance. The obtaining actual acceptance here as well is necessary because it goes directly to the fundamental issue of juror bias, which is what Rule 431B seeks to root out. I mentioned that. Well, excuse me, but the last paragraph of that particular section says, The Court's method of inquiry shall provide each juror an opportunity to respond to specific questions concerning the principles set out in this section. It doesn't say, in fact, it says the Court's method and specific questions. It doesn't say the language that's set forth above. So that seems to give the Court some opportunity to phrase the questions in more of the vernacular so that people might understand it better. The Court's method could refer to whether he or she asks all the potential jurors to raise their hand in response to one question, or if he or she asks the individual  Accepts and understands is common language, and even though accept is a precise term which should be used, the common language need not be altered for the potential jurors to understand what they're doing. But if it's altered in a different way other than the judge did here, so are you saying it always has to say accepts and understands? That's the best practice. Was that what Atherton says, a case out of this appellate district? Right. Atherton dealt with willing to follow. And willing to follow is a different type of phrasing than take issue or had a problem with. I think you're actually right. I think willing to follow implies to me that you accept the principles. And I have to say, candidly, this whole issue of the problem with the zerid management is very perplexing and frustrating to me because it's not that difficult as a trial judge to say, you understand and accept the following propositions, Mr. So-and-so, and you go right down them. End of discussion. Because I agree. You know, take issue with or sometimes judges will say, do you have any quarrel with? Well, you might not have a quarrel with it. It doesn't mean that you truly accept what the principle is. So this whole thing should be avoided because to me it should not be that onerous or burdensome to do it the right way. That is also the defendant's position, Your Honor. He summed it up well for you. Yes. Thank you. Thank you. If you have no other questions about the 431B issue, I'd like to move on to the second claim error. Could I ask you this, too, in the course of your argument? Hopefully you'll do this because it seems like both of your arguments hinge on the ultimate overarching question, is the evidence closely balanced? Because if it's not, theoretically you have a problem with the zero issue and you have the issue with the video as well. I'm sorry. What was that one? With the video as well. That issue also runs into the issue of whether or not the evidence is closely balanced, does it not? Yes. Absolutely. I should say it turns on the issue. The video was perhaps the most essential piece of evidence here. And that's why these prosecutors' remarks are so, they're so destructive, for lack of a better term, to really the juror's province here. The prosecutor said in opening that the jury would see a ricochet. And then in closing on rebuttal, she also said that the jurors would see a ricochet from a bullet. And she pointed it out to him on, or to the jurors on the screen. And then she said specifically, there's no way that ricochet could have come from a bullet fired by Jeronica, which is Mr. Sugg's shooter. There's actually no way that the prosecutor herself could have known where that bullet came from. And presenting those statements as fact on rebuttal invades the province of the jury who had just the same opportunity to view the video as did the prosecutor, as well as Mr. or, excuse me, Officer Jenkins, in regard to the second argument. There is a line also between reasonable inference and mere speculation, and that is what we're dealing with as far as the prosecutor's statement in opening and closing. Moving on to the closely balanced evidence, there are two plausible versions of what happened here. The defendant did refute the State's version, and the only witness actually present was Mr. Harris. The rest of the witnesses had no personal knowledge of what occurred on that day. There were no firearms ever recovered in this case. But there was a bullet recovered, was there not? There were seven bullets recovered. But, I mean, from two different guns. Six from the one gun. Correct. And one 9mm. Correct. There's no proof that that bullet was not there before or that it came from a second gun, because the expert actually said that there was some corrosion on the bullet. So there's no absolute way to say, yes, there were two guns. It's simply closely balanced. But the expert also said that there's no way it could have come from a .45. Correct. Or a BB gun. Correct. Which the defendant testified. He said he had a BB gun at the end. Correct. So that sort of refutes his testimony, doesn't it? The defendant, when he testified, said that he did not have anything in his hands and that the object he's seen holding as he's going over the neighbor's fence is a BB gun and that it's actually supported by the evidence in the case that shows he was in possession of a BB gun that looked strikingly similar to what he was holding in that video. Moreover, on the very day of the incident, the officers found another pneumatic airsoft rifle paintball gun, I believe, in the vehicle, which lends credence to the fact that this defendant used those types of machines. What about perhaps the state's strongest item of circumstantial evidence, and that is the gunshot residue that was found on the defendant, which having said thus wouldn't be there had he not been exposed to a gunshot or fire event? Right. The gunshot residue, really there are three ways that gunshot residue can be found on a person, and it doesn't necessarily always mean that that person fired a gun. The defendant could have been in the environment where something was fired. The defendant may have touched something that had recently been fired and that had gunshot residue on it. The defendant was shot in the right leg, and the gunshot residue was found on the right leg. So it's theoretical that the gunshot residue from Mr. Suds' gun transferred over to Mr. Harris. But wasn't there some testing? How far away from Mr. Suds was he when he was shot? It varied because Mr. Suds kept backing up. At one point, there were varying feet, and I do not recall off the top of my head the exact amount he was when he first started, possibly about 12 feet, and the expert in this case on cross-examination said, yes, depending on the wind and the weather, GSR can be sent up to 14 feet or more. So the fact that the assessment was that would support the State's argument, would it not? I mean, it was not a contact wound or something within 4 or 5 feet, was it? The bullet? Yeah. No. It was from some sort of distance, but as far as whether or not that didn't incur the GSR, there's no way to tell because of the possible distance that the GSR could travel, not to mention the other reasons that it could be in – on his hands. This was a jury trial? Yes. Was it fair to say, though, that the expert's testimony tended to favor the State's warrant and defendant given the distances? Because your argument would have put it at the outer bounds of how he could have gotten at him. Not necessarily, Your Honor. Because the expert did say that it could be 14 feet or more depending on the wind and the weather, there's no evidence as to what the wind and the weather was like that day other than the fact that it appeared to have rained at some point. You're opening the door to a possibility, not a probability, I mean, in all honesty. It's a possibility, which, again, indicates closely balanced evidence here. Other factors that make this closely balanced, again, like I said, there was no gun ever recovered in this case, and there were shards of glass that were used as evidence, but there's no evidence that those shards of glass actually came from the Jeep that Mr. Harris was in. There is some testimony that called into question Officer Kudebeck's credibility regarding this muzzle flash. He stated that – initially that he did discuss it with Mr. Harris, but then later on he said that he didn't see it until after the grand jury. So it does call into question and create a credibility contest. If Your Honors have no other questions regarding the closely balanced, I will move on to the last argument. And that is because a police officer who had no personal knowledge of the underlying incident invaded the province of the jury, telling them that the video showed a muzzle flash originating from that Jeep, this case should be reversed and remanded. The officer's testimony stated – Could the officer say anything about what he or she observed on that video as the testimony went on? Did the officer – Could the officer have said anything based upon the officer's experience about what he or she saw happen in that video? The officer could testify to there's obvious muzzle flashes, you see light. There are things that can be seen, which he can perhaps comment on, but as far as narrating and insinuating that this is obvious and completely indicative that Mr. Harris shot a gun is, again, invading the province of the jury. He was in no better position than the jurors to say that there was a muzzle flash. The muzzle flash that he says he sees is an event of smoke that has no flash. So for that testimony to be admitted, it should have been admitted by somebody who had specialized knowledge as an expert. He wasn't an expert, but is it reasonable to believe that officers have had experience either with gunshot sighting out in the public or when they have to go for their training where they actually shoot? It's reasonable as far as this testimony because of the muzzle flash, where it was an obvious flash. Go ahead and finish your thoughts. The other flash, which is supposed to be indicative of Mr. Harris having a gun, there is no flash. There's just an event of smoke, and there's no testimony that says a muzzle flash can occur without a flash. Would they have had to qualify him as an expert if they were going to allow him to testify to that? Yes. Yes, Your Honor. If Your Honors have no other questions, we ask that this case be reversed. Thank you. You'll have an opportunity for response. Thank you. Ms. Joseph? Ms. Joseph, why don't we start where we left off? We have a lay witness basically testifying to something that he saw on a video. He's not an expert, so we have to look at the Sprinkle case. You have a witness's opinion, not an expert, not confined to statements of fact, that the witness has personal knowledge because they've never really laid a foundation for that. How is this properly admitted? Well, when we look at prejudice. May I start with a good morning, Your Honor? Victoria Joseph for the State of Illinois. Thank you for the court. Counsel. We're looking at the rule of evidence, the Illinois Rule of Evidence 701, which talks about what a witness may testify to if they are not testifying as an expert. And they may form opinions or inferences, and those opinions or inferences are limited to those rationally based on the perception of the witness, which the Fourth District discussed in Mister based on the Supreme Court's case in Thompson, saying that it's the perception of the actual video that's being watched, not personal knowledge of the event itself. So doesn't the video speak for itself? That is why we go on to B. It is helpful to clear understanding of the witness's testimony or the determination of a fact and issue. The fact and issue was did the defendant fire an illegal firearm? And that is what this is helping to narrate. Even in the defendant's reply brief on page 4, they admit to the difficulties in viewing this video, saying that it depicts quick movements in an outdoor setting and is likely far more subjective than a video in a controlled environment. The court found it was helpful here to know what was going on. Though we may not have 100 people during a demonstration, we had four actors in a very quick amount of time. I know I viewed the video over and over and over again, and it was difficult to see what was going on inside of that vehicle based on the distance and the quality. So it was helpful to have a clear understanding of whether he fired a gun. So based upon your viewing it, so you're saying that you had a clear understanding once the police officer told you what he saw? It helped me to determine what was going on when I did view it. Yes, Your Honor. And then it is not based on scientific, technical, or other specialized knowledge. That is the third element of the rule. And the people maintain that a gun being fired, emitting either an explosion, a flash of light, or smoke is within common knowledge. That is not scientific knowledge. You can open any comic book and see depictions of guns being fired with the drawing emitting a flash of light or smoke coming out of the gun. So in this case, it was helpful. The officer had to slow down the video. He had to zoom into the video in order to see what was the best he could, what was going on inside of that vehicle. And there was an activity that occurred. It was helpful in understanding that. And the jury was free to weigh his evidence and reject it. And in comparison to the other muzzle flashes, which the defendant also introduced in the opening statement, that there would be muzzle flashes going on. So whether the term muzzle flash is what the problem is, there was something seen inside of the video that could be indicative of a gun being fired. Even if this officer was not qualified as an expert, was he qualified as two years of service and, you know, use of guns, seeing guns used, anything of that nature? I believe they would... Did anyone lay a foundation for that? Not that he was... He did say that he was not qualified as an expert in ballistics. I'm trying to get to the actual... Okay, sorry. Let's see if I remember right. Okay. It appears that they did not get into anything other than on the recross examination that he was not an expert in identifying muzzle flashes and had taken no classes of such. I do not believe that there was anything specifically about shooting a gun otherwise. So we'd make a fairly compelling argument that there was some error committed by the officer's testimony during the video as well as the zeroed monitoring itself. Inevitably, you need to tell us why we should find that the evidence was not closely balanced because of the confinement that would prompt the argument over point error. Well, Your Honors, we are not conceding that there was an error in the zeroed monitoring. Well, I know you're not conceding it, but we need to know... That's fine. And I don't disagree with Your Honor that if judges could, say, understand and accept and move on through the court principles, it would make my job very easier. And I don't disagree that that is what I would consider something simple to do. However, we're looking at it as, is this reversible error? Is it harmless error? Well, we're not looking at it as harmless error in this situation. I understand. Just because we're under plain error. If it was clear or there was some indication that the lay witness's testimony were error, could you argue it was harmless error? Oh, as far as the lay testimony. Yes, Your Honor. Because we do have other evidence supporting the firing of a gun. Who's that? We have the shell casing found near the car that was different than all of the other shell casings. We did have one witness who testified that there were up to seven gunshots heard. We have the gunshot residue on the defendant's hands. And Your Honors were asking about all of the distances. Yes. What's your take on that? Because she's saying that, hey, it could have very well come from a substance. The testimony here is we had the officer testify that when he measured the seven spots, seven places in the parking lot, that it was 22 feet and 4 inches from the car. He admitted during his grand jury testimony that it was 10 to 15 feet. I don't know that there was a question asked had he measured it before his grand jury testimony or whether that was his guess, a reasonable estimate. But he did measure it and it was 22 feet 4 inches. The GSR expert testified that normally, under normal circumstances, it is 4 to 6 feet. Yes, the expert admitted it could be 14 or more feet, but generally we're working within a 4 to 6 foot range, and even if it was 10 feet, we are well beyond that range, that you have this combination of the gunshot residue, the shell, the sound of the gun being fired, and what appeared to be a gun in his hand shortly after. He may have denied it and he may have claimed it was a BB gun, but it is all part of the circumstantial chain of evidence that supports that there was a gun that was fired within that video as well as the ricochet, which could be... The arguments here tend to be internally inconsistent with each other. In one instance, complaining that the officer testified to what he saw on the video. In another, complaining that nobody testified to what was seen in the video and the prosecutor doing it instead. But there was an activity that took place and the entirety of the argument was talking about Suggs' aim and the direction in which he was firing the shot, excuse me, in a straight line into the car. And that is why the argument was there's no way the ricochet came from that gun because of the direction that the gun was being fired as opposed to the defendant who was sitting awkwardly in the car. That was the argument that it came from what was fired inside the car. What's your response to your opponent indicating that there was some corrosion on that shell casing? Did the jury hear about that? The jury didn't hear about that, Your Honor. The expert, I believe, discussed what each bullet appeared to look like and there's nothing indicative that that meant it had been sitting there forever as opposed to being part of this firing here. I mean, it's just as with no guns recovered, it's just as likely do we know for certain that the other six shots came from the gun that was fired that day or were they also sitting there before it happened. So we, it becomes... So we have to know for certain, isn't it beyond a reasonable doubt? It's beyond a reasonable doubt. It is not beyond every certainty of a doubt, Your Honor. And it is, which makes it, you have seven casings found that day that line up with the other evidence, especially when you did have one witness that heard up to seven gunshots being fired. You had the activity going on that could reasonably infer to be a gunshot being fired from that car. There is evidence in this case that at least two homes within a proximity of this location have video cameras. That is correct, Your Honor. Does that leave one to believe that there was a reason that they had video cameras and maybe this is an area where there have been shootings? And they're concerned, obviously, for their families first and foremost. They're concerned, obviously, as the one video indicated, they were rounding up the children. And I cannot remember precisely if they asked the homeowners why they had the video cameras, but I know that the one asked, had you heard gunshots before? And they said yes. So it is a reasonable inference that they had the cameras specifically because it was a crime area that they were concerned about. And so that could support the fact that that 9mm had been there before this particular incident. It could support that, but we don't have to raise every piece of evidence to establish reasonable doubt. It just as well supports with the other activities and the other evidence going on that it was fired that day. The bullet or did the bullet actually enter the defendant's leg or was it just a grazed wound? Because did we have a recovery of a .45 caliber from his leg? I don't remember seeing that. I don't remember. That might lead, if we did, that might lead some credibility or lend some credibility to the fact that the .45s were new because that's what's in his leg. I don't recall that testimony, Your Honor. So the people do maintain that there was sufficient physical evidence beyond that, which was just a credibility determination between two competing versions, between the defendant's version that he either didn't have a gun or that he had a BB gun that day and that he actually fired a firearm that produced a shell casing, gunshot residue, a ricochet. And some kind of flash or smoke from within the vehicle. How would your basic summary that you've just made impact on the improper prosecutorial comment issue during closing argument? Well, the improper – the people maintain there was no improper closing argument. The two instances were the attack saying that the prosecutor commented on the credibility of the experts. And while it is improper to personally vouch for credibility, it is not improper to make an argument concerning credibility. And here, if we take the entire context of the argument, which began with the statement that the evidence we are presenting to show it was not a BB gun, has no motive, no bias, and no interest in this case, going directly into discussing the forensic scientists having no – did not care about the outcome. So it's relating – directly relating to their lack of motive, bias, or interest. And they're basing it on scientific evidence and facts, and that is why they're not lying. That was not a personal vouching. That was a discussion of their credibility and why they completely believed. It was invited by complaining about the forensic scientists guessing and being unsure. And these were reasonably characterized as responses to their closing argument challenging the forensic scientists and addressing their credibility as a whole. As I mentioned earlier, the inference was from the video. The video was properly admitted. They are not complaining about its omission, which means it was evidence that was presented at trial from which reasonable comment – fair and reasonable comment can be made. The jury was free to view it themselves, and if they didn't see that there was a ricochet there, they could reject it. And they were so admonished and instructed by the court on Reported Proceedings 829. Are there any other questions down there? No. Thank you. We ask that you withdraw. Thank you. Ms. Vick. Thank you, Your Honors. In response to a few points made by counsel, first, it's important to point out that the standard here is not reasonable doubt. It's closely balanced evidence, which is a less onerous standard than reasonable doubt. The Mr. Case reference actually goes to the narrator's identification of a defendant in that video, whereas here there is no question as to identification. So what the officer is seeing is exactly the same things as the jury, therefore he is in no better position than the jury to make those assessments. The event of smoke that was seen in the vehicle, again, as I said before, is not necessarily within the common knowledge of every juror. Perhaps it's within the common knowledge of the average gun owner, but a muzzle flash that contains no flash would not necessarily be within the common knowledge of every juror. The defendant's position is that the arguments are not inconsistent between the ricochet testimony, excuse me, the ricochet argument and the muzzle flash argument. The muzzle flash argument was based on improperly opinion, whereas the ricochet was a theory concocted by the prosecutor on rebuttal. The defendant had no opportunity to respond. The defendant had no opportunity to defend himself. The prosecutor presented that as fact, which, again, invaded the province of the jury. And then as to the officer's testimony, the fact that he was in a position of authority as an officer does make that testimony more prejudicial. If your honors have no other questions, thank you. We ask for reverse and remand. Thank you. Thank you very much. Thank you again for your arguments. We will take the matter under advisement. We'll issue a decision in due course. We will stand at recess pending our final case. Thank you.